# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| ELLEN & MARK S. BALAGNA, *et al.*, | No. 14-21 L |
| For Themselves and As Representatives of a Class of Similarly Situated Persons, | Judge Elaine D. Kaplan |
| | Electronically Filed August 5, 2016 |
| Plaintiffs, | |
| v. | |
| THE UNITED STATES OF AMERICA, | |
| Defendant. | |

**THE UNITED STATES' MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST PLAINTIFF CITY OF CANTON AND MEMORANDUM IN SUPPORT**

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................................. 1

LEGAL BACKGROUND ...................................................................................................... 1

    I. The National Trails System Act and the "Railbanking" Process ........................... 1

    II. The Trails Act and the Fifth Amendment ................................................................ 5

FACTUAL BACKGROUND ................................................................................................. 6

PROCEDURAL BACKGROUND ......................................................................................... 8

SUMMARY JUDGMENT STANDARD .............................................................................. 9

ARGUMENT ............................................................................................................................ 9

    I. The City is a creature of Illinois, and its property belongs to Illinois. ............... 10

    II. The United States Constitution attributes the District's actions to Illinois. ...... 11

    III. Illinois has no right to just compensation because it consented to any incidental effect on its property rights. ...................................................................................... 12

CONCLUSION ...................................................................................................................... 14

## TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ............................................................................................................. 9

*Barclay v. United States*,
   443 F.3d 1368 (Fed. Cir. 2006) ..................................................................................... 5, 13

*Birt v. STB*,
   90 F.3d 580 (D.C. Cir. 1996) ............................................................................................. 4

*Byrne v. Chi. Gen. Ry. Co.*,
   48 N. E. 703 (Ill. 1897) .................................................................................................... 11

*Caldwell v. United States*,
   57 Fed. Cl. 193 (2003) ....................................................................................................... 3

*Celotex Corp. v. Catrett*,
   477 U.S. 317 ....................................................................................................................... 9

*City of New Orleans v. Clark*,
   95 U.S. 644 (1877) ..................................................................................................... 10, 11

*City of Trenton v. New Jersey*,
   262 U.S. 182 (1923) ......................................................................................................... 11

*City of Worcester v. Worcester Consol. St. Ry. Co.*,
   196 U.S. 539 (1905) ......................................................................................................... 11

*Grantwood Vill. v. Mo. Pac. R.R.*,
   95 F.3d 654 (8th Cir. 1996) ................................................................................................ 4

*Hunter v. City of Pittsburgh*,
   207 U.S. 161 (1907) ................................................................................................... 10, 11

*J. J. Henry Co. v. United States*,
   411 F.2d 1246 (Ct. Cl. 1969) ........................................................................................... 12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ........................................................................................................... 9

*Nat'l Ass'n of Reversionary Prop. Owners v. STB*,
   158 F.3d 135 (D.C. Cir. 1998) ........................................................................................... 2

*Nat'l Bd. of YMCA v. United States*,
   395 U.S. 85 (1969) ............................................................................................... 10, 12, 14

*Nat'l Bd. of YMCA v. United States*,
   396 F.2d 467 (Ct. Cl. 1968) ............................................................................................. 12

*Neb. Trails Council v. STB*,
   120 F.3d 901 (8th Cir. 1997) .............................................................................................. 3

*Pennsylvania v. New Jersey*,
   426 U.S. 660 (1976) ................................................................................................. 1, 9, 14

*Preseault v. ICC* (*Preseault I*),
   494 U.S. 1 (1990) ...................................................................................................... passim

*RLTD Ry. Corp. v. STB*,
   166 F.3d 808 (6th Cir. 1999) .................................................................................... 2, 3, 4

*Sun Oil Co. v. United States*,
   572 F.2d 786 (Ct .Cl. 1978) ............................................................................................. 12

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
　535 U.S. 302 (2002) .................................................................................................. 13
*Textainer Equip. Mgmt. Ltd. v. United States*,
　99 Fed. Cl. 211 (2011) ............................................................................................... 12
*Vill. of N. Pekin v. Riviere*,
　392 N.E. 2d 439 (Ill. App. Ct. 1979) ......................................................................... 11
*Ward v. Field Museum of Nat. History*,
　89 N.E. 731 (Ill. 1909) .............................................................................................. 11

**Statutes**
16 U.S.C. § 1247(d) ............................................................................................... 3, 5, 13
49 U.S.C. § 10903(a)(1)(A) (1982) ................................................................................ 2
49 U.S.C. § 10903(a)(1)(B) (1982) ................................................................................ 2
49 U.S.C. § 10904(c) ...................................................................................................... 7
65 Ill. Comp. Stat. 5/2-1-1 ............................................................................................ 10
70 Ill. Comp. Stat. 1205/2-1 ......................................................................................... 11
Pub. L. No. 98-11 ............................................................................................................ 3

**Rules**
RCFC 12(b)(6) ................................................................................................................ 8
RCFC 56 ........................................................................................................................ 14
RCFC 56(a) ..................................................................................................................... 9
RCFC 56(c)(1) ................................................................................................................ 9
RCFC 56(c)(1)(A) ........................................................................................................... 9

**Regulations**
49 C.F.R. § 1152.27 ........................................................................................................ 7
49 C.F.R. § 1152.29 .................................................................................................. 4, 13
49 C.F.R. § 1152.29(a)(2) .............................................................................................. 4
49 C.F.R. § 1152.29(e)(2) ..................................................................................... 3, 5, 13
49 C.F.R. §§1105.7 ......................................................................................................... 6

**Other Authorities**
*Black's Law Dictionary*
　(7th ed. 1999) ............................................................................................................ 12
Restatement (Third) of Agency
　(Am. Law. Inst. 2006) ............................................................................................... 11
*The Shifting Sands of Property Rights, Federal Railroad Grants, and Economic History:*
　*Hash v. United States and the Threat to Rail-Trail Conversions*,
　38 Envtl. L. 711 (2008) ............................................................................................... 2

## TABLE OF EXHIBITS

| Bates Range | Contents | Date |
|---|---|---|
| STB1 | STB Decision | 1/24/2013 |
| STB12 | STB Decision-NITU | 5/24/2013 |
| STB22 | District's Request for Extended Negotiations to 5/22/14 | 11/15/2013 |
| STB34 | BNSF No Objection to District's Request for Extension of NITU | 11/19/2013 |
| STB37 | BNSF Response to NITU Issuance | 1/24/2013 |
| STB41 | District's Request for Pub. Use & Int. Trail Use Cond | 1/23/2013 |
| STB46 | Notification of Filing Notice of Exemption | 9/13/2012 |
| STB66 | Notice of Exemption for Abandonment | 1/4/2013 |
| STB79 | Env. & Hist. Reports | 11/29/2012 |
| STB99 | Assessments & Comments | 9/24/2012 |
| STB159 | BNSF No Objection to District's Request for Extension of NITU | 5/15/2014 |
| STB160 | District's Request for Extended Negotiations to 11/22/14 | 5/15/2014 |
| STB161 | STB Grant of District's Request to Extend Negotiations to 5/22/14 | 11/20/2013 |
| STB162 | STB Grant of District's Request to Extend Negotiations to 11/22/14 | 5/22/2014 |
| STB163 | District's Request for Extended Negotiations to 5/22/15 | 11/17/2014 |
| STB164 | BNSF No Objection to District's Request for Extension of NITU | 11/18/2014 |
| STB165 | STB Grant of District's Request to Extend Negotiations to 5/22/15 | 11/25/2014 |
| STB166 | District's Request for Extended Negotiations to 11/22/15 | 5/18/2015 |
| STB167 | BNSF No Objection to District's Request for Extension of NITU | 5/21/2015 |
| STB168 | STB Grant of District's Request to Extend Negotiations to 11/22/15 | 6/5/2015 |
| STB172 | STB Order | 3/21/2016 |

## INTRODUCTION

One Illinois agent, the Canton Park District (the District), proximately caused an alleged taking for which another Illinois agent, the City of Canton (the City), seeks just compensation under the Fifth Amendment to the United States Constitution. Illinois has no right to just compensation for the reasonably foreseeable consequences of its own actions. "No State can be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976).

BNSF Railway Co. sought to abandon a railway corridor through the City. The District requested the Surface Transportation Board (STB) to allow BNSF and the District to negotiate over a trail use agreement for that corridor. With BNSF's consent, the STB delayed granting BNSF's request to abandon its rail corridor, so the District and BNSF could negotiate. For that very delay in abandoning the railway corridor over the City's land, the City now seeks just compensation from the United States under the Fifth Amendment. A straightforward application of *Pennsylvania* demonstrates that the City can obtain no just compensation because Illinois suffered no effect that it did not cause to itself or to which it did not consent.

## LEGAL BACKGROUND

### I. The National Trails System Act and the "Railbanking" Process

At its height in the 1920s, the continental United States had more than 270,000 miles of rail track servicing the nation's public and freight transportation needs.[1] As the United States' new interstate highway system expanded and competed with rail service and as rail service costs rose, railroad use quickly began to decline, and railroads began abandoning thousands of miles of

---

[1] *Preseault v. ICC* (*Preseault I*), 494 U.S. 1, 5-6 (1990).

railroad corridors.[2] By the late 1970s, Congress recognized that it was losing a vast network of transportation corridors. It concluded that the United States could provide the railroads a mechanism for retaining that transportation network for future rail service reactivation, and the public could benefit in the meantime by using the railroad corridors as recreational trails.

Until 1983, a railroad could only terminate active rail service, generally, in one of two ways. First, a railroad could ask the STB to permit it to "discontinue" service. *See* 49 U.S.C. § 10903(a)(1)(B) (1982). This authority allows the railroad to decide "to cease operating a line for an indefinite period while preserving the rail corridor for possible reactivation of service in the future." *Preseault v. ICC* (*Preseault I*), 494 U.S. 1, 6 n.3 (1990); *see also Nat'l Ass'n of Reversionary Prop. Owners v. STB*, 158 F.3d 135, 137 n.1 (D.C. Cir. 1998) ("A line that is no longer in use, but has not been officially abandoned, may be reactivated later and is termed 'discontinued.'").

Second, a railroad could ask the STB to permit it to terminate its service over a corridor through an abandonment proceeding. *See* 49 U.S.C. § 10903(a)(1)(A) (1982). Even if, at the end of that proceeding, the STB permits the railroad to abandon its interest, so the railroad need not consummate the abandonment. The regulations give railroads one year to consummate abandonment by filing a notice with the STB. 49 C.F.R. § 1152.29(e)(2); *see also RLTD Ry. Corp. v. STB*, 166 F.3d 808, 810 (6th Cir. 1999) ("Actual abandonment pursuant to authorization is known as 'consummation.'"). If the railroad does not consummate abandonment within that year of the STB granting permission, the railroad's authority to abandon "automatically

---

[2] James Lily, *Rail-to-Trail Conversions: How Communities Are Railroading Their Way Out of Recession Towards Healthy Living*, 2 U. Balt. J. of Land & Dev. 167 (2003); Danaya C. Wright, *The Shifting Sands of Property Rights, Federal Railroad Grants, and Economic History: Hash v. United States and the Threat to Rail-Trail Conversions*, 38 Envtl. L. 711, 722 (2008).

expire[s]." 49 C.F.R. § 1152.29(e)(2). Thus, a railroad could permanently abandon a rail line *only if* (a) the STB authorizes the abandonment (or exemption) and (b) the railroad decides to consummate it. *See Preseault I*, 494 U.S. at 5 n.3 (distinguishing between "'abandonment' of a rail line and 'discontinuance' of a service," and recognizing that once "a carrier 'abandons' a rail line pursuant to authority granted by the [ICC], the line is no longer part of the national transportation system").

In the National Trails System Act Amendments of 1983, Congress created a third method for abandoning a rail corridor. Pub. L. No. 98-11, § 208, 97 Stat. 42 (1983) (codified at 16 U.S.C. § 1247(d)) (amending the National Trails System Act ("Trails Act"), Pub. L. No. 90-543, 82 Stat. 919 (1968)). There, Congress created a "railbanking" system that allows railroads to preserve abandoned rail corridors for potential future rail service. *See Neb. Trails Council v. STB*, 120 F.3d 901, 903 n.1 (8th Cir. 1997) ("'Railbanking' refers to the preservation of railroad corridor for future rail use."); *Caldwell v. United States*, 57 Fed. Cl. 193, 194 (2003) (recognizing that under the railbanking process, "[t]he right-of-way is 'banked' until such future time as railroad service is restored."), *aff'd*, 391 F.3d 1226 (Fed. Cir. 2004). Railbanking allows the railroad to terminate its immediate use of a rail line, while preserving the STB's jurisdiction over the rail corridor, and while ensuring that the rail corridor remains available for future active rail service. *See RLTD Ry.*, 166 F.3d at 811.

If the railroad chooses to railbank the rail corridor, the Trails Act allows it to transfer rail corridor management to a private or public entity (a trail sponsor) until it seeks to reactivate the rail corridor. 16 U.S.C. § 1247(d). If a trail sponsor "assume[s] full responsibility for management of such rights-of-way and for any legal liability arising out of such transfer or use," the Trails Act allows the trail sponsor to use the rail corridor for a trail during that interim period.

3

*Id.* The Trails Act prohibits anyone from treating that interim use "as an abandonment of the use of such rights-of-way for railroad purposes." *Id.*

But the Trails Act did not define all of the administrative details for negotiating and establishing a railbanking arrangement. Congress assigned the STB a duty to "impose such terms and conditions as a requirement of any transfer or conveyance for interim use," *id.*, and the STB issued regulations under that authority. 49 C.F.R. § 1152.29. Those regulations allow a railroad to railbank a rail corridor by applying to the STB to abandon it or by requesting from the STB an exemption to the abandonment process. *See id.* § 1152.29(c), (d). The regulations direct the STB to issue a Notice of Interim Trail Use or Abandonment (NITU) if its docket establishes three conditions: (1) a potential trail sponsor informed the STB it seeks to use the rail corridor in the interim for trail use; (2) the potential trail sponsor stated it would assume managerial, legal, and tax responsibility for the right-of-way, *id.* § 1152.29(a); and (3) the "railroad agree[d] to negotiate an interim trail use/rail banking agreement [with the potential trail sponsor.]" *Id.* § 1152.29(d)(1). The STB will later dissolve the NITU if the potential trail sponsor does not fulfill its responsibilities in 49 C.F.R. § 1152.29(a)(2).

After the STB issues a NITU, the regulations give the railroad and trail sponsor 180 days to reach a trail use agreement. *Id.* § 1152.29(d)(1). During this time, the STB retains jurisdiction over the rail corridor and authority to extend the negotiation period for the NITU if the railroad and the potential trail sponsor ask for an extension. *See Birt v. STB*, 90 F.3d 580, 588-90 (D.C. Cir. 1996); *Grantwood Vill. v. Mo. Pac. R.R.*, 95 F.3d 654, 659 (8th Cir. 1996). During those negotiations, and unless or until the railroad and the potential trail sponsor reach an agreement, the NITU lets the railroad "discontinue service, cancel any applicable tariffs, and salvage track and materials, consistent with interim trail use and rail banking . . . ." 49 C.F.R. § 1152.29(d)(1).

The trail use agreement, if any, ultimately identifies and describes the rail corridor ownership rights that the railroad transferred to the trail sponsor. *Id.* § 1152.29(h).

If the railroad and the potential trail sponsor fail to reach a railbanking and trail use agreement and decline to ask the STB for an extension, the NITU "converts into an effective notice of exemption" that allows the railroad to "abandon the line entirely and liquidate its interest." *Barclay v. United States*, 443 F.3d 1368, 1371 (Fed. Cir. 2006) (quotations omitted). At that point, the railroad may take one of three possible actions: (1) consummate abandonment of the rail corridor, end the STB's jurisdiction over the rail line, and remove the rail line from the national transportation system; (2) continue rail service on the rail line; or (3) ask the STB to extend the time to consummate abandonment. *See* 49 C.F.R. § 1152.29(e)(2).

## II. The Trails Act and the Fifth Amendment

Both the Supreme Court and the Federal Circuit have addressed the framework for analyzing whether the actions taken by the United States and the STB under the Trails Act could take private property rights for which the Fifth Amendment requires just compensation.

In 1990, the Supreme Court addressed the question whether the Trails Act violates the Fifth Amendment. *Preseault I*, 494 U.S. at 4. It reasoned that "even if the rails-to-trails statute gives rise to a taking," it requires compensation. *Id.* Therefore, it held, the Trails Act does not violate the Fifth Amendment. *Id*. at 4.

The Supreme Court interpreted the statement in Section 1247(d) that interim trail use "shall not be treated, for any purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." *Id*. at 8 (quoting 16 U.S.C. § 1247(d)). It suggested that that language could conceivably take private property for public use. It concluded that the Trails Act may cause a taking if a railroad would have abandoned its easement, and if, but for Section 1247(d), specific terms in the deed by which the railroad owned the easement or state

5

law would have required the easement to revert to a private owner. *Id*. The Court further explained that "[b]y deeming interim trail use to be like discontinuance rather than abandonment, . . . Congress prevented property interests from reverting under state law[.]" *Id*. Thus, according to the Supreme Court's guidance in this context, a taking may occur when the Trails Act "preclud[es] reversion of state property interests." *Id*. at 9.

In her concurring opinion, Justice Sandra Day O'Connor emphasized the importance of state law in determining "whether a railway right of way lapsed upon the conversion to trail use." *Id.* at 20 (O'Connor, J., concurring). If a right-of-way would have "lapsed" but for the Trails Act, Justice O'Connor explained, the United States' actions under the Trails Act "may delay property owners' enjoyment of their reversionary interests, but that delay burdens and defeats the property interest rather than suspends or defers the vesting of those property rights." *Id*. at 21-22. Justice O'Connor's concurring opinion further concluded that "the existence of a taking will rest upon the nature of the state-created property interest[s] that petitioners would have enjoyed absent the federal action and upon the extent that the federal action burdened that interest." *Id*. at 24.

### FACTUAL BACKGROUND

In September 2012, BNSF began the process for completely abandoning 14.5 miles of rail corridor in Illinois between Milepost 52.2 in Farmington and Milepost 66.7 in Dunfermline (the Rail Line). [BNSF] Notification of Filing Notice of Exemption, STB46. It notified several agencies and local governments of its intentions, and several agencies sent comments that supported its efforts. Assessments and Comments, STB99. In November 2012, BNSF filed its Environmental and Historic Reports. STB79; *see* 49 C.F.R. §§1105.7, 1105.8.

Next, BNSF filed in January 2013 its Notice of Exemption for Abandonment with the STB. STB66. Two weeks later, the STB concluded that BNSF had satisfied the requirements for

abandoning the Rail Line. STB Decision (Jan. 24, 2013), STB1. The STB found no cause to stay the exemption: no offer of financial assistance, no negative environmental assessment, and no request for interim public use. *Id.* Through an "offer of financial assistance," a third-party could "offer to subsidize or purchase the railroad line that is the subject of such application." 49 U.S.C. § 10904(c); 49 C.F.R. § 1152.27.

The STB approved BNSF's request to abandon the Rail Line effective on February 23, 2013, as long as no new information arose that would cause the STB to change its approval. *Id.* One day before issuing this decision, the District asked the STB to issue a NITU and to permit it to negotiate with BNSF over acquiring the Rail Line to use it as a trail. District's Request for Pub. Use & Int. Trail Use Cond., STB41. The next day, BNSF notified the STB that it did not object to the STB issuing a NITU to stop the abandonment while it and the District negotiated. BNSF Resp. to NITU Issuance, STB37. The STB issued a NITU on May 27, 2013. STB Decision-NITU, STB12. The NITU gave BNSF and the District until November 2013 to reach an agreement for interim trail use. *Id.* at 3. The STB found that, if BNSF and the District did not reach an agreement by then, BNSF could fully abandon the Rail Line. *Id.* at 3-4.

The District has asked the STB to extend the deadline five times, most recently until November 2016.[3] BNSF consented every time, and the STB only granted the extensions because the District requested them.

---

[3] District's Request to Extend Negotiations to 5/22/14, STB22; BNSF No Objection to District's Request for Extension of NITU, STB34; STB Grant of District's Request to Extend Negotiations to 5/22/14, STB161; District's Request to Extend Negotiations to 11/22/14, STB160; BNSF No Objection to District's Request for Extension of NITU, STB159; STB Grant of District's Request to Extend Negotiations to 11/22/14, STB162; District's Request to Extend Negotiations to 5/22/15, STB163; BNSF No Objection to District's Request for Extension of NITU, STB164; STB Grant of District's Request to Extend Negotiations to 5/22/15, STB165; District's Request to Extend Negotiations to 11/22/15, STB166; BNSF No Objection to District's Request for

**PROCEDURAL BACKGROUND**

On January 8, 2014, Plaintiffs Mark and Ellen Balagna filed a complaint in this Court, on behalf of themselves and those similarly situated. Class Action Compl. ¶¶ 48, 51, ECF No. 1. The Balagnas alleged that the STB physically took their interest in the right-of-way on their property when the May 24, 2013, NITU prevented BNSF's easement from merging with their fee simple rights. *Id.* at 2. The City joined as a plaintiff in the Second Amended Complaint. *Compare* Pls.' First Am. Class Action Compl., ECF No. 9, *with* Pls.' Second Am. Class Action Compl., ECF No. 19. By now, the Court has certified the class, and Plaintiffs have filed a fourth amended complaint with sixty-five plaintiffs. Pls.' Fourth Am. Class Action Compl., ECF No. 36; Class Certification Order, ECF No. 26.

Separately, other plaintiffs have alleged that they own property along this Rail Line, and they have filed a separate complaint, with the same counsel. *Batterton v. United States*, No. 16-405-L (Fed. Cl. Mar. 30, 2016). The plaintiffs in that case filed a notice stating that it indirectly relates to this case. *Batterton*, No. 16-405-L, ECF No. 4. Among the plaintiffs, that complaint names the Village of Norris. Compl., No. 16-405-L, ECF No. 1.

On June 7, 2016, the Court directed the United States to file any motion to dismiss the City. Scheduling Order, ECF No. 70. Because the United States is relying on documents other than just the Fourth Amended Class Action Complaint, it is moving for partial summary judgment against the City instead of filing an RCFC 12(b)(6) motion to dismiss.

---

Extension of NITU, STB167; STB Grant of District's Request to Extend Negotiations to 11/22/15, STB168; STB Order, STB172.

**SUMMARY JUDGMENT STANDARD**

RCFC 56(a) directs this Court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* If the opposing party demonstrates that a court could find in its favor, the opposing party establishes a genuine dispute as to a material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A movant may rely on "particular parts of materials in the record, including depositions, documents, . . . affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials." RCFC 56(c)(1)(A).

The party moving for summary judgment bears the initial burden of establishing the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the moving party meets its initial burden, the non-moving party may genuinely dispute that fact by "citing to particular parts of materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." RCFC 56(c)(1). In evaluating motions for summary judgment, courts view any inferences drawn from the underlying facts in the light most favorable to the non-moving party; they do not make credibility determinations or weigh evidence. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

**ARGUMENT**

"No State can be heard to complain about damage inflicted by its own hand." *Pennsylvania v. New Jersey*, 426 U.S. at 664. Here, the City, one agent of Illinois, is complaining about damage allegedly inflicted by the District, another agent of Illinois. Because Illinois

9

caused its own alleged injury deliberately, and thereby consented to it, it has no right to just compensation. *See Nat'l Bd. of YMCA v. United States*, 395 U.S. 85, 92 (1969).

**I. The City is a creature of Illinois, and its property belongs to Illinois.**

The City manages Illinois's property on behalf of Illinois. The City is a municipal corporation. *See* 65 Ill. Comp. Stat. 5/2-1-1 ("All courts shall take judicial notice of the existence of all cities . . . incorporated under this code"). From the United States Constitution's perspective, because Illinois created the City of Canton as a municipal corporation, the City manages Illinois's property as an agent for Illinois. *See Hunter v. City of Pittsburgh*, 207 U.S. 161, 179 (1907); *City of New Orleans v. Clark*, 95 U.S. 644, 654 (1877) ("A city is only a political subdivision of the State, made for the convenient administration of the government."). In particular, it is a "subordinate agent" that implements Illinois's powers over Illinois's property. *New Orleans*, 95 U.S. at 654.

In *Hunter*, for example, the Pennsylvania General Assembly enacted a bill that allowed the City of Pittsburgh to consolidate with the City of Allegheny. 207 U.S. at 174. Allegheny argued that Pennsylvania took its property without due process of law by subjecting it to Pittsburg's higher taxes. *Id.* at 177-78. The Supreme Court rejected that proposition. It held that Pennsylvania exercised plenary authority over the city's property: it "may modify or withdraw all such powers, may take without compensation such property, hold it itself, or vest it in other agencies, expand or contract the territorial area, unite the whole or a part of it with another municipality, repeal the charter and destroy the corporation." *Id.* at 178-79. Thus, "[i]n all these respects the state is supreme," and the "power is in the state." *Id.* at 179. Applied here, any property that the City owns belongs to Illinois; the City just manages it as Illinois's agent and at

Illinois's complete discretion. *See id.*; *New Orleans*, 95 U.S. at 654.[4] Thus, the City is pursuing just compensation for the taking of Illinois's property rights.

**II. The United States Constitution attributes the District's actions to Illinois.**

At the same time, the District is acting on behalf of Illinois as a separate municipal corporation. *See* 70 Ill. Comp. Stat. 1205/2-1, 2-8 ("All courts in this state shall take judicial notice of all park districts."); *Ward*, 241 Ill. at 508. From the perspective of the United States Constitution, a municipal corporation "is merely a department of the State, and the State may withhold, grant or withdraw powers and privileges as it sees fit. However great or small its sphere of action, it remains the creature of the State exercising and holding powers and privileges subject to the sovereign will." *City of Trenton v. New Jersey*, 262 U.S. 182, 187 (1923). As Illinois's agent, the District acts on behalf of Illinois. *City of Worcester v. Worcester Consol. St. Ry. Co.*, 196 U.S. 539, 549 (1905) ("a municipal corporation is not only a part of the state, but is a portion of its governmental power."). Thus, the United States Constitution attributes the District's actions to Illinois. *Cf.* Restatement (Third) of Agency § 2.04 cmt. b (Am. Law. Inst. 2006) ("respondeat superior is a basis upon which the legal consequences of one person's acts may be attributed to another person.").[5]

---

[4] The Illinois Supreme Court similarly recognizes that state political subdivisions have no rights to own property independent of the Illinois government. "[Municipal] corporations being purely of legislative creation for local government, the Legislature may control and dispose of their property as shall appear to be best for the public." *Ward v. Field Museum of Nat. History*, 89 N.E. 731, 736 (Ill. 1909).

[5] Illinois law also recognizes that the District is acting on behalf of Illinois. It stated, for example, that "[t]he city of Chicago, to the extent of the jurisdiction delegated to it by its charter, is but an effluence from the sovereignty of Illinois, governs for Illinois, and its authorized legislation and local administration of law are legislation and local administration by Illinois through the agency of that municipality." *Byrne v. Chi. Gen. Ry. Co.*, 48 N. E. 703, 705 (Ill. 1897) (quotations omitted); *Vill. of N. Pekin v. Riviere*, 392 N.E. 2d 439, 439 (Ill. App. Ct. 1979) (labeling a municipality a "subsidiary" of the sovereign state).

### III. Illinois has no right to just compensation because it caused and consented to any incidental effect on its property rights.

The City is seeking United States taxpayer dollars as just compensation for the easement the NITU prevented from merging with its servient property. But from the United States Constitution's perspective, Illinois, through the District, was seeking to establish a trail for its citizens under the Trails Act, and it caused any delay in receiving its property interest in the easement that it would have received upon BNSF abandoning the Rail Line. The Fifth Amendment does not require just compensation when Illinois pursued a process for its benefit and thereby consented to any incidental effects.

"Not every deprivation of use, possession, or control of property is a taking." *Sun Oil Co. v. United States*, 572 F.2d 786, 818 (Ct .Cl. 1978). When the United States intends to benefit a particular property owner, "fairness and justice" do not require the United States to pay for losses that property owner suffers. *Nat'l Bd. of YMCA*, 395 U.S. 85, 92 (1969). Moreover, when a property owner consents to the United States physically occupying its land, through a contract for example, the property owner has no right to just compensation under the Fifth Amendment. *See Nat'l Bd. of YMCA v. United States*, 396 F.2d 467, 475 (Ct. Cl. 1968), *aff'd*, 395 U.S. 85 (1969); *Textainer Equip. Mgmt. Ltd. v. United States*, 99 Fed. Cl. 211, 218-19 (2011) (Firestone, J.); *see also J. J. Henry Co. v. United States*, 411 F.2d 1246, 1249 (Ct. Cl. 1969) ("The [Fifth] [A]mendment has limited application to the relative rights in property of parties litigant which have been voluntarily created by contract."); Black's Law Dictionary 1625 (7th ed. 1999) (describing the legal maxim, "Consensus tollit errorem. Consent removes an error. • A person cannot object to something he has consented to"). Courts effectively presume that the property owner negotiated in the contract for appropriate compensation. *See Sun Oil*, 572 F.2d at 818.

The City alleges that the NITU caused a taking by preventing the easement over its land from lapsing,[6] so the City would have otherwise owned unencumbered land. Fourth Am. Compl. ¶¶ 288, 293-295, 306. But the District proximately caused the NITU. And from the United States Constitution's perspective, the City does not own any property independently of Illinois, and the District acts as an agent of Illinois. The United States Constitution attributes the District's actions to Illinois and the City's property to Illinois. Doing so demonstrates that Illinois caused the alleged taking of its own property.

Illinois proximately caused the NITU and all of the extensions for negotiating with BNSF. That NITU and those requests for extensions led the STB both to initiate and to perpetuate the easement by which the City alleges the temporary taking occurred. Initially, BNSF had chosen to abandon the Rail Line, and it applied to the STB for permission to do so. STB66; STB67. Without any interested potential trail sponsor, the STB would have had no power to issue the NITU. 49 C.F.R. § 1152.29. The STB would have allowed BNSF to abandon the Rail Line. *See id.* § 1152.29(e)(2); *Barclay*, 443 F.3d at 1371 (quoting *Preseault I,* 494 U.S. at 7). Illinois stopped that abandonment by requesting the NITU, and it further prevented BNSF from abandoning the Rail Line by asking the STB to extend the negotiation period five times. But for Illinois's actions, BNSF would have either consummated abandonment of the Rail Line

---

[6] The United States understands that the City disputes the United States' position that the NITU has caused only a temporary taking. But until the District or some other potential trail sponsor negotiates a trail use agreement with BNSF, BNSF may still abandon its property right. *See* 49 C.F.R. § 1152.29(h). Only if BNSF reaches a trail use agreement could the City's claims ripen into a permanent taking. Indeed, at this point, no trail use agreement has triggered the clause in the Trails Act that has resulted in takings in most other cases: that trail use "shall not be treated, for any purposes of any law or rule of law, as an abandonment of the use of such rights-of-way for railroad purposes." 16 U.S.C. § 1247(d). Indeed, the Fifth Amendment does not require just compensation for every temporary invasion. *See, e.g., Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 337 (2002) (refusing to adopt a bright-line rule that a temporary moratorium on development was a per se taking).

or withdrawn its application. These facts demonstrate that Illinois voluntarily caused the NITU, and its decision caused it to delay the easement merging with its own property.

Illinois voluntarily consented to and availed itself of a statutory mechanism by which it could obtain a trail for its own benefit. "Fairness and justice" do not require United States taxpayers to pay damages to Illinois for Illinois's delay in deciding whether to enter into a trail use agreement with BNSF or to let BNSF abandon the Rail Line. Illinois's agent, the City of Canton, has no right to any compensation because Illinois caused its own injury and consented to the very taking it is alleging. *See Pennsylvania v. New Jersey*, 426 U.S. at 664; *Nat'l Bd. of YMCA*, 395 U.S. at 92.

## CONCLUSION

For the reasons set forth above, the City has no right to just compensation for the taking it alleges. RCFC 56 requires this Court to enter judgment against the City.

Respectfully submitted, August 5, 2016,

JOHN C. CRUDEN
Assistant Attorney General

*/s/ Jared S. Pettinato*
JARED S. PETTINATO
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 305-0203
(202) 353-0506 (fax)
Jared.Pettinato@usdoj.gov

*Attorneys for the United States*