# In the United States Court of Federal Claims

Nos. 14-21L/16-405L (Consolidated)
(Filed: October 5, 2017)

| | |
|---|---|
| ELLEN AND MARK S. BALAGNA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. <br><br><br> ROBERT AND SUSAN BATTERTON, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES OF AMERICA, <br><br> Defendant. | Keywords: Fifth Amendment's Takings Clause; Rails-To-Trails Conversion; Notice of Interim Trail Use; 26 U.S.C. § 1247(d); Crossing Rights; Municipal Corporation; Compensable Taking. |

*Mark F. ("Thor") Hearne, II*, Arent Fox LLP, Washington, DC, with whom were *Meghan S. Largent*, *Lindsay S.C. Brinton*, and *Stephen S. Davis*, for Plaintiffs.

*Sarah Izfar*, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, U.S. Department of Justice, Washington, DC, with whom was *Jeffrey H. Wood*, Assistant Attorney General, for Defendant.

## OPINION AND ORDER

**KAPLAN, Judge.**

These consolidated rails-to-trails takings cases involve sixty-seven properties abutting a 14.5-mile railroad right-of-way in Fulton County, Illinois. The right-of-way is currently the subject of a Notice of Interim Trail Use (NITU) issued by the Surface Transportation Board (STB), although no final trail use agreement has been reached.

Before the Court are cross-motions for summary judgment regarding several issues. First, the government has moved for summary judgment with respect to two of the properties, contending that the railroad owns the relevant portions of those properties in fee simple. Second, the government has moved for summary judgment with respect to any landowners' claims that the issuance of the NITU resulted in a taking of their right to access properties (or portions of properties) that may be reached only by crossing the right-of-way. Finally, the government has moved for summary judgment with respect to the claims of two plaintiffs, the City of Canton (City) and the Village of Norris (Village), which are Illinois municipal corporations rather than private landowners. The landowners oppose all the government's motions and have cross-moved for summary judgment as to the issues raised in the government's motion.

As discussed below, under Illinois state law, the railroad owns the part of the railroad corridor crossing the two landowners' properties in fee simple. Thus, the government is entitled to summary judgment as to those two properties. Further, under Illinois law, the landowners are guaranteed a right to access their properties, and the issuance of the NITU does not affect those state law crossing rights. Finally, the Court concludes that no compensable taking of the City's or the Village's property has occurred under the particular circumstances of this case. The government is thus entitled to summary judgment as to those claims as well.[1]

---

[1] On April 24, 2017, after the landowners filed their cross-motion, the government moved to stay further briefing pending the Federal Circuit's resolution of an appeal in another rails-to-trails case. ECF No. 115; see also Notice of Appeal, Caquelin v. United States, No. 14-37 (Fed. Cl. Mar. 4, 2016), ECF No. 35. On May 10, 2017, the Court denied the motion, concluding that the balance of interests did not favor a stay. See Order at 1, ECF No. 117. On June 21, 2017, the Federal Circuit issued an unpublished opinion in Caquelin directing the Court of Federal Claims to conduct additional factual proceedings in that case. See 2017 WL 2684180, at *3 (Fed. Cir. June 21, 2017) (per curiam) (instructing the trial court to more fully develop the factual record by applying a multi-factor analysis based on factors set forth in the Supreme Court's ruling in Ark. Game & Fish Comm'n v. United States, 568 U.S. 23 (2012)). In the government's reply brief in this action, filed on June 23, 2017, the government referenced this ruling, stating that it sought "to inform the Court of the importance of adopting the Arkansas Game & Fish multi-factor approach in light of developments in controlling case law" and that "[t]he Federal Circuit's order in Caquelin directly affects the outcome of this action, and, with an eye toward conserving the Court's and the parties' resources, bears consideration." See The United States' Resp. in Opp'n to Pls.' Mot. for Summ. J. & Reply in Further Supp. of its Mot. for Summ. J. at 14, ECF No. 122. The government noted, however, that it was "not repeat[ing] its request for a stay," and it did not ask the Court to take any particular action based on the Federal Circuit's unpublished Caquelin order. See id. at 13. Accordingly, the Court concludes that the court of appeals' remand in Caquelin has no bearing on the legal issues raised in the pending cross-motions for summary judgment.

## BACKGROUND[2]

### I.     The Right-of-Way and the Notice of Interim Trail Use

Since the 1850s, the Burlington Northern Santa Fe Railroad Company (BNSF) or its predecessors-in-interest has held an interest in certain properties along a 14.5-mile right-of-way in Fulton County, Illinois. See Joint Stips. Regarding Title Matters at 1–2 & n.1, ECF No. 55. The parties agree that for most of the properties, BNSF held an easement granting it, at minimum, a right-of-way to use the burdened land for railroad purposes. See id.; see also Pls.' Resp. at 4.

On January 4, 2013, pursuant to 49 C.F.R. § 1152.50, BNSF filed an application before the STB to abandon the right-of-way.[3] See Pls.' Reply Ex. 6 at 79, ECF No. 126-1. On January 23, 2013, pursuant to 26 U.S.C. § 1247(d) and 49 C.F.R. § 1152.29(d), the Canton Park District (CPD) filed a Request for Public Use Condition and Request for Interim Trail Use with the STB, indicating its willingness to assume financial responsibility for the corridor.[4] See Pl.'s Reply Ex. 7 at 139–41, ECF No. 126-2.

After BNSF agreed to negotiate an interim trail use/rail banking agreement with CPD, the STB issued an NITU for the right-of-way on May 24, 2013. See Pl.'s Reply Ex. 10 at 148. The STB has extended the deadline for negotiating a final trail use agreement several times, and the current deadline is November 22, 2017. See Landowners' Mot. to Suppl. Their Resp. to the Gov't's Mot. for Summ. J. With New Relevant Fact Ex. 1, ECF No. 118-1; see also Decision, BNSF Railway Company—Abandonment Exemption—In Fulton County, Ill., No. AB-6-486-X (STB June 2, 2017). Thus, no final trail use agreement yet exists.

### II.    The Balagna Action

Plaintiffs Ellen and Mark Balagna own land traversed by the BNSF right-of-way. Compl. ¶¶ 25–26, ECF No. 1; id. Ex. 5, ECF No. 1-5. On January 8, 2014, they filed a complaint in this Court seeking just compensation under the Fifth Amendment's Takings

---

[2] Unless otherwise specified, the facts set forth in this section are undisputed.

[3] Under 49 U.S.C. § 10903(d), a rail carrier may abandon a line "only if the [STB] finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance."

[4] CPD is an Illinois municipal corporation that "manages 1,403 acres of open space" in Fulton County. See History & General Information, Canton Park District, http://cantonpark.org/wordpress/history-general-information/ (last visited Oct. 3, 2017). The park district "serve[s] a base population of seventeen thousand individuals" and "offers many unique and varied recreational opportunities." See id. CPD's "boundaries are the same as those of Canton Township." See id.

Clause based on the issuance of the NITU. Compl. ¶¶ 44–51. Specifically, they alleged that the NITU had:

> (a) forestalled or taken from [them] their state law "reversionary" right to their property; (b) appropriated an easement across [their] property for an interim public-access recreational trail[;] and (c) appropriated an easement for a potential future railroad right-of-way across [their] property and . . . taken from [them] the rights they enjoy under Illinois law to the exclusive use and physical occupation of their land.

Id. ¶ 39; see also id. ¶¶ 44–51. The Balagnas filed their complaint as a class action on behalf of themselves and all similarly situated land owners. Id. ¶ 29. On September 9, 2014, upon the parties' stipulation, the Court certified an opt-in class under Rule 23(c)(1) of the Rules of the Court of Federal Claims (RCFC). Class Cert. Order at 2, ECF No. 26. The class may consist of:

> All persons who (a) own or owned parcels of land underlying the BNSF['s] . . . railroad corridor located between railroad mileposts 52.2 in Farmington and 66.7 in Dunfermline, Illinois . . . and (b) claim that the [STB] took their property rights to possession, control, and enjoyment of a segment of the [r]ailroad [c]orridor when [it] issued [the NITU] . . . .

Id.

Among the members of the class are Deborah and Gregor Herberger and the Jenine C. Hinton Trust (Trust). See 4th Am. Compl. ¶¶ 58–61, 82–85, ECF No. 36; The United States' Mot. for Summ. J. & Mem. in Supp. (Def.'s Mot.) at 13, ECF No. 90. The properties that the Herbergers and the Trust now own once belonged to Ms. Mary Snider. See Pl.'s Resp. at 30; id. Ex. 19. In 1858, BNSF's predecessor-in-interest obtained a condemnation order for the portion of the right-of-way crossing Ms. Snider's property. See Pls.' Reply Ex. 5 at 64, 66, 71.

The City of Canton is also a member of the class in the Balagna action. See 4th Am. Compl. ¶¶ 179–81. It owns property that abuts and underlies the right-of-way. Id.; see also id. Ex. 43, ECF No. 36-4 (City of Canton's deed to property in Fulton County, Illinois).

## III.    The **Batterton** Action

Robert and Susan Batterton also own land traversed by the BNSF right-of-way. See Compl. ¶ 26, Batterton, No. 16-405L, ECF No. 1. On March 30, 2016, the Battertons and five co-plaintiffs filed a complaint in this Court. See id. at 1–3. Like the Balagna plaintiffs, the Batterton plaintiffs seek just compensation under the Fifth Amendment's Takings Clause based on the issuance of the NITU. Id. ¶¶ 63, 67–75.

The Village of Norris is one of the plaintiffs in the <u>Batterton</u> action. <u>Id.</u> ¶¶ 44–48. It is a municipal corporation that owns property that abuts and underlies the right-of-way. <u>See</u> <u>id.</u>; <u>see also</u> <u>id.</u> Ex. 9, ECF No. 1-9 (Village of Norris's deed to property in Fulton County, Illinois).

Because the cases involve common questions of law and fact, the Court consolidated the actions on September 8, 2016. <u>See</u> Order Consolidating Cases, <u>Batterton</u>, No. 16-405L, ECF No. 12.

## IV.   The Pending Motions for Partial Summary Judgment as to Certain Plaintiffs and Claims

On August 5, 2016, before the Court consolidated the cases, the government filed a motion for partial summary judgment as to the City of Canton's claims. ECF No. 73. On September 20, 2016, after the Court consolidated the cases, the government similarly moved for partial summary judgment as to the Village of Norris's claims. ECF No. 81. The City and the Village filed a combined response on September 23, 2016. ECF No. 82. The government filed a reply on October 11, 2016. ECF No. 83. The Court then requested supplemental briefing from the parties. <u>See</u> Suppl. Briefing Order, ECF No. 92.

In the meantime, the government filed its motion for partial summary judgment as to the additional liability issues on December 15, 2016. ECF No. 90. On March 6, 2017, the Court then stayed consideration of the government's motions as to the City and the Village pending completion of briefing on the government's additional motion. Order, ECF No. 107. The landowners filed their cross-motion on March 9, 2017. ECF No. 110. The Court granted several extensions of time with respect to the parties' responses and replies, <u>see</u> ECF Nos. 113, 121, 124, and heard oral argument on all the pending motions on September 20, 2017.

## DISCUSSION

## I.   Jurisdiction

The Tucker Act grants the Court of Federal Claims jurisdiction to "render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Fifth Amendment's Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. Accordingly, "[i]f there is a taking, the claim is 'founded upon the Constitution' and within the jurisdiction of the [Court of Federal Claims] to hear." <u>Preseault v. Interstate Commerce Comm'n</u> (<u>Preseault I</u>), 494 U.S. 1, 12 (1990) (quoting <u>United States v. Causby</u>, 328 U.S. 256, 267 (1946)).

It is well-established that the issuance of an NITU pursuant to 16 U.S.C. § 1247(d) and 49 C.F.R. § 1152.29(d) may give rise to a compensable taking. <u>Id.</u> at 13–14; <u>see also</u> <u>Preseault v. United States</u> (<u>Preseault II</u>), 100 F.3d 1525, 1552 (Fed. Cir. 1996) (en banc). Accordingly, the Court has jurisdiction over this action.

## II.        Standard for Motions for Summary Judgment

The standards for granting summary judgment are well established. Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. RCFC 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994). All significant doubts regarding factual issues must be resolved in favor of the party opposing summary judgment. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing Anderson, 477 U.S. at 248). The court should act with caution in granting summary judgment and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

## III.       Standards for Liability in Rails-to-Trails Takings Cases

Under the Takings Clause, the federal government must pay just compensation when it "requires [a] landowner to submit to the physical occupation of his land." Yee v. City of Escondido, 503 U.S. 519, 527 (1992) (emphasis omitted); see also Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 831 (1987) (observing that the appropriation of a public easement across a private landowner's premises "constitute[s] the taking of a property interest"); Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982).

In a rails-to-trails takings case, the STB's issuance of an NITU results in a compensable taking if a plaintiff has a "state law reversionary interest[]" in the land subject to the railroad right-of-way that is "effectively eliminated in connection with [the] conversion of [the] railroad right-of-way to trail use."[5] Caldwell v. United States, 391 F.3d 1226, 1228 (Fed. Cir. 2004) (citing Preseault II, 100 F. 3d at 1543); see also Rogers v. United States, 814 F.3d 1299, 1303 (Fed. Cir. 2015) ("The government must provide just compensation under the Fifth Amendment['s] Takings Clause if the issuance of a NITU results in the taking of private property."). The court's first task, then, is to determine whether the plaintiff had such a reversionary interest by ascertaining the nature

---

[5] As the Federal Circuit has noted, because "traditional common law estates terminology . . . . describes an easement as a 'use' interest" rather than as "a 'possessory' interest," a plaintiff's retained interest in land burdened by an easement would not classically be described as a "reversionary" interest. Preseault II, 100 F.3d at 1533. Regardless of how the plaintiff's retained interest is characterized, "the result upon termination of the easement is the same." Id. at 1534.

of the plaintiff's interest in the right-of-way (if any) at the time the NITU was issued. <u>See</u> <u>Ellamae Phillips Co. v. United States</u>, 564 F.3d 1367, 1373 (Fed. Cir. 2009) (citing <u>Preseault II</u>, 100 F.3d at 1533); <u>see also</u> <u>Rogers</u>, 814 F.3d at 1303 ("[A] private party's valid interest in the property-at-issue is a prerequisite to a taking.").

To do so, the court first examines whether, under state law, "the railroad acquired only an easement or obtained a fee simple estate." <u>Ellamae Phillips Co.</u>, 564 F.3d at 1373. If the railroad acquired the property in fee simple, the court's inquiry ends. <u>See</u> <u>Rogers</u>, 814 F.3d at 1303, 1305–06; <u>Chi. Coating Co. v. United States</u>, 131 Fed. Cl. 503, 508, <u>appeal docketed</u>, No. 17-2198 (Fed. Cir. 2017).

On the other hand, "if the railroad acquired only an easement," the court goes on to assess whether "the terms of the easement [were] limited to use for railroad purposes," or whether "they include[d] future use as a public recreational trail." <u>Ellamae Phillips Co.</u>, 564 F.3d at 1373. Finally, "even if the grant of the railroad's easement was broad enough to encompass a recreational trail," the court must decide whether the easement "terminated prior to the alleged taking so that the property owner at the time held a fee simple unencumbered by the easement." <u>Id.</u> If the railroad acquired an easement limited only to railroad purposes, or if any easement the railroad obtained was extinguished before the issuance of the NITU, then the issuance of the NITU interferes with the plaintiff's state law property rights and triggers the application of the Takings Clause. <u>See</u> <u>Caldwell</u>, 391 F.3d at 1233–35.

## IV.   Application of Standards

### A.   <u>The Properties Owned by the Herbergers and the Trust</u>

As noted, the Herbergers and the Trust share a common predecessor-in-interest, Mary Snider, from whom BNSF's predecessor-in-interest obtained its property interest via a condemnation order. <u>See</u> Pls.' Reply Ex. 5 at 64–65, 71. The condemnation order was apparently issued in 1858 and recorded in 1867. <u>See id.</u> at 66, 72. As relevant to this case, it stated that, in exchange for one hundred and fifty dollars, a portion of Mary Snider's "lands and real estate," described in a report attached to the order, was "vested in the . . . Company in for during the Continuance of the said Company as a Corporation." <u>Id.</u> at 67, 71; <u>see also</u> Pls.' Reply Ex. 5-A at 75–76. The order further stated that the railroad "may take possession of, hold[,] and use the [conveyed property] for the purposes of said Rail road." Pls.' Reply Ex. 5 at 71; <u>see also</u> Pls.' Reply Ex. 5-A at 76.

In 1858, condemnation actions in Illinois were governed by a state legislative act of June 22, 1852 (the "1852 Act"). <u>See</u> Def.'s Mot. Ex. 3, ECF No. 90-4. Under the 1852 Act, when a railroad required property that it could not "obtain[] by purchase," it could file a petition with the clerk of the local circuit court "requesting such court to cause to be ascertained the compensation to be made to each owner of or person interested in [the] property." <u>Id.</u> at 90–91. "[U]pon payment there of," the railroad could then obtain "by an order or orders of court the right and title" to the property. <u>See id.</u> at 91.

To determine the compensation to be paid to the landowner, the 1852 Act provided for the court's appointment of a board of local commissioners, who would survey the land and provide a report "stating . . . the compensation to be paid." Id. at 93. The Act further provided that "[u]pon the making and filing of [the] report" and "the payment of the compensation," "if no appeal [wa]s taken," the "right and title to that part of each tract of land required . . . shall vest in the [railroad] . . . with the right to enter upon and use and apply the same for the purposes stated in the petition." Id.

The Illinois Supreme Court has consistently held that condemnation orders issued under the 1852 Act, including condemnations for railroad purposes, granted title in fee simple to petitioning railroads. See Keen v. Cleveland, Cincinnati, Chi. & St. Louis Ry. Co., 64 N.E.2d 499, 505 (Ill. 1945) (observing that "[t]he right[] in and the power to take real estate by condemnation" under the 1852 Act "was the right to take and acquire fee-simple title"); Bartlow v. Chi., Burlington & Quincy R.R. Co., 90 N.E. 721, 723 (Ill. 1909) ("Under the [1852 Act], when property was taken and condemned for public use[,] the condemnation was of the entire property, and the assessment of damages was held to be in satisfaction of all the title to the property, including the fee simple and all lesser estates."); see also Marathon Oil. Co. v. Heath, 358 F.2d 34, 36–37 (7th Cir. 1966) (construing Illinois law and reaching the same conclusion).

Notwithstanding the foregoing, the landowners argue that the condemnation order in this case granted BNSF's predecessor-in-interest only an easement over the Herbergers' and the Trust's properties. See Pls.' Resp. at 30–36. Their arguments, which rely in significant part upon the decision of the Illinois court of appeals in Abrams v. Royse, 569 N.E.2d 1329 (Ill. App. Ct. 1991), are unpersuasive.

In Abrams, the Illinois court of appeals interpreted an 1849 state law entitled "An Act to provide for a general system of railroad incorporations" (the "1849 Act"). See 569 N.E.2d at 1330. It concluded that under the 1849 Act, "the estate acquired [by the railroad] is a right-of-way for the purposes of the railroad and, when that purpose is no longer being met, the land reverts to the underlying landowner." Id. at 1334. In so concluding, the Illinois court of appeals specifically distinguished between the effect of an order under the 1849 Act (which applied only to railroads) and one under the 1852 Act (which was a general condemnation statute). See id. at 1331 (noting the "large difference in the scope of the two Acts" and recognizing that in a condemnation under the 1852 Act, the railroad would have received a fee simple estate).

The condemnation order in Abrams was issued in 1867. See id. at 1330. The Court is not aware of any decisions by the Illinois Supreme Court (as opposed to the Illinois court of appeals) that similarly apply the 1849 Act to condemnation orders issued after 1852. More to the point, in Abrams neither party contested the trial court's conclusion that the 1849 Act (and not the 1852 Act) was applicable. Id.

In this case, however, the Court concludes that the authority for the condemnation order was the 1852 Act, not the 1849 Act. While the language of the condemnation order itself is less than clear, it is undisputed that the charter of BNSF's predecessor-in-interest provided that where it was necessary for the railroad to secure land by condemnation, the

compensation to be paid to a landowner and the right to use the lands "shall be fixed and secured in the manner provided [in the 1852 Act] and in no other manner." Pls.' Reply Ex. 4 at 63. Further, the Court finds it significant that the railroad's prior charter had stated that where it was necessary for the railroad to acquire property through condemnation, it would be accomplished "in the manner provided for in [the 1849 Act]." Pls.' Reply Ex. 3 at 57. Thus, a deliberate decision was made to amend the charter for the specific purpose of ensuring that the 1852 Act (rather than the 1849 Act) would apply to condemnation actions pursued by the railroad after the amendment.

Notwithstanding the foregoing, the landowners cite a number of cases in which the Illinois Supreme Court construed certain language in deeds and conveyances post-dating the 1852 Act to grant railroads easements only, rather than title in fee simple. See Pls.' Resp. at 32–33 (citing, inter alia, Cleveland, Cincinnati, Chi. & St. Louis Ry. Co. v. Cent. Ill. Pub. Serv. Co., 43 N.E.2d 993, 996 (Ill. 1942); Tallman v. E. Ill. & Peoria R.R Co., 41 N.E.2d 537, 539 (Ill. 1942); and Branch v. Cent. Trust Co., 151 N.E. 284 (Ill. 1926)). But the task of construing a deed differs from the Court's inquiry here. In interpreting a deed, the court's lodestar is to ascertain the parties' intent. Tallman, 41 N.E.2d at 539; see also Urbaitis v. Commonwealth Edison, 575 N.E.2d 548, 551–52 (Ill. 1991); Keen, 64 N.E.2d at 502. Here, by contrast, the condemnation order resulted from an adversarial process governed by statute, so that the Court's focus must be on that process, which executed the intent of the legislature, and not on the parties.

In any event, the Court is not persuaded by Plaintiffs' argument that the language of the order indicates that something less than a fee simple estate was conveyed to the railroad. For example, the Court does not find it significant that the caption of the order characterizes the petition filed by the railroad as a "petition for a right of way." See Pls.' Reply Ex. 5 at 66. The condemnation order itself does not use the phrase "right of way"; to the contrary, it describes the property at issue as consisting of "the lands and real estate . . . described in plats attached to [the Commissioners'] report." Id. at 67. And (as already discussed) the Illinois Supreme Court has recognized that a railroad had the power to acquire property through a condemnation in fee simple. Cleveland, Cincinnati, Chi. & St. Louis Ry. Co, 43 N.E.2d at 996 (observing that "[t]he general condemnation laws in force prior to the adoption of the Constitution in 1870 provided that a railroad company in acquiring title for a right of way should take it in fee simple").[6]

The landowners also rely upon the clauses in the Order stating that the railroad "may take possession of, hold and use the [property] for the purposes of said Rail road" and that the property was conveyed "in for during the continuance of the said Company as a Corporation." See Pls.' Reply Ex. 5 at 71. According to Plaintiffs, this language limited the purposes for which the railroad could use the property and also limited the

---

[6] When Illinois adopted a new constitution in 1870, it "effected a change in the condemnation power of railroads . . . by providing that railroads may acquire no more than an easement over [any] right of way taken." Marathon Oil Co., 358 F.2d at 37 n.6; see also Peoria & Rock Island Ry. Co. v. Birkett, 62 Ill. 332, 336 (1872); see also Def.'s Mot. Ex. 4 at 98, ECF No. 90-5.

duration of its use to the life of the condemning company (or its successors) as a corporation.

But the clause stating that property may be used "for the purposes of said Rail road" does not conclusively establish that the estate being acquired is an easement. See Chi. Coating, 131 Fed. Cl. at 511 (applying Illinois law and observing that such language may "merely explain[] the motivation" for the conveyance). And in this context, the phrase in the order vesting the property interest in the condemning railroad "in for during the continuance of the said Company as a Corporation" need not be read as imposing a limitation on the estate being conveyed based on the duration of the railroad as a corporate entity, for that language may also be traceable to the language of the 1852 Act. See Def.'s Mot. Ex. 3 at 93 (stating that the "right and title" to the condemned property will be vested in "the . . . corporation or person in whose behalf the proceeding" was filed). In any event, the Court does not believe that the use of this ambiguous phrase is sufficient to suggest that the condemning court, acting under the authority of the 1852 Act, intended something less than an estate in fee simple to be granted to the railroad.[7]

In short, the Court concludes that the condemnation order was issued pursuant to the 1852 Act and that BNSF's predecessor-in-interest obtained title in fee simple from Mary Snider. The Herbergers and the Trust therefore have no reversionary interest in the land and cannot be entitled to compensation based on the issuance of the NITU. The government's motion for summary judgment as to their claims is therefore **GRANTED**.

### B.    The Landowners' Rights of Access

The government has also moved for summary judgment as to any claims by the landowners that their rights to cross the railroad corridor to access their properties have been taken as a result of the issuance of the NITU. See Def.'s Mot. at 15–22. The government acknowledges that the right-of-way divides several of the properties, leaving portions of them inaccessible save by crossing the right-of-way. Id. at 16. It also acknowledges that several other properties are entirely inaccessible except by crossing the right-of-way.[8] Id. It argues, however, that the landowners have a right to access their

---

[7] The landowners also direct the Court's attention to the fact that, consistent with the procedural requirements of the 1849 Act, the condemnation order recites that the court appointed five commissioners to prepare a report determining the amount of compensation to be paid the landowners. Pls.' Resp. at 34. The 1852 Act, on the other hand, provided for the appointment of three commissioners. See id. As with the opaque clauses in the order described in the text, this potential procedural irregularity does not supply an adequate justification for overriding the conclusions to be drawn from the railroad's amended charter and the case law discussed above.

[8] Neither party has provided evidence regarding how these properties or portions of properties are currently accessed.

lands under Illinois state law, and that the issuance of the NITU has not displaced that right.

The Court agrees with the government that the landowners possess essentially the same state-law crossing rights following the issuance of the NITU as they previously enjoyed. Illinois law disfavors the creation of land-locked parcels. See Granite Props. Ltd. P'ship v Manns, 512 N.E.2d 1230, 1236 (Ill. 1987) (holding that if a conveyance creates a land-locked parcel, an easement permitting access to the parcel "is implied by way of necessity" unless "a contrary intent is manifested"); Deisenroth v. Dodge, 131 N.E.2d 17, 21 (Ill. 1955) ("[A]n easement by way of necessity . . . may be implied where the [conveyed] land is surrounded by land of the grantor or others." (quotation omitted)); Canali v. Satre, 688 N.E.2d 351, 353 (Ill. App. Ct. 1997) ("[I]t is presumed that the [conveying] parties d[o] not intend to render the land unfit for occupancy."). And the Illinois legislature has specifically provided that railroads must provide crossings to farm properties. 625 Ill. Comp. Stat. Ann. 5/18c-7504. Based on this authority, the Court concludes that, to the extent the prospective trail corridor divides properties or impedes access to such properties, state law will provide the landowners with a right to cross it. See Beggs v. Ragdale, 457 N.E.2d 1079, 1082 (Ill. App. Ct. 1983) (observing that "[a] principle of concurrent rather than exclusive use underlies the law concerning easements" and that "the owner of the dominant estate . . . cannot for the sake of his convenience, materially alter the easement so as to . . . interfere with the use and enjoyment of the servient estate by its owner").

There is no merit to the landowners' argument that the pervasive federal regulatory scheme governing railway corridors has preempted Illinois law with respect to crossing the corridor. See Pls.' Resp. at 41–44 (citing the preemption provision of the Interstate Commerce Commission Termination Act of 1995, 49 U.S.C. § 10501(b)). Section 10501(b) states that the STB has exclusive jurisdiction over rail transportation and "the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities." As applied to rails-to-trails cases, courts have determined that "only abandonment claims [are] within the exclusive jurisdiction of the STB." Sears v. United States, 132 Fed. Cl. 6, 26, appeal docketed, No. 17-2172 (Fed. Cir. 2017). As such, "[w]ith specific regard to access rights over a former railroad right-of-way under state law, both [the Court of Federal Claims] and the STB have held that such rights are not preempted by the Trails Act and thus state law continues to apply to those rights." Id.; see also James v. United States, 130 Fed. Cl. 707, 734 (2017) (rejecting preemption argument and observing that "[t]here is no support in [state] law or in the Trails Act for plaintiffs' argument that, by operation of the Trails Act, plaintiffs lost their crossing rights when the NITU was issued"); Dana R. Hodges Tr. v. United States, 111 Fed. Cl. 452, 456–57 (2013) (rejecting landowners' argument that state laws granting right of crossing are pre-empted and holding that the landowners were in "no-wise impeded from exercising whatever rights of access they held that pre-existed the conversion of the railroad corridor to recreational usage"); Jie Ao and Xin Zhou—Pet. For Declaratory Order, Docket No. FD 35539, 2012 WL 2047726, at *7 (S.T.B. June 6, 2012) (observing that "property disputes involving prescriptive easements are generally best addressed by state courts applying state law," and that state courts can determine whether an easement to cross would unduly interfere with rail operations).

In short, the Court concludes that Illinois law provides the landowners with a right to cross the right-of-way. Further, Illinois law is not pre-empted by the Trails Act. Accordingly, the government's motion seeking summary judgment that the issuance of the NITU did not affect the landowners' crossing rights is **GRANTED**.[9]

### C.    Whether the NITU Resulted in a Compensable Taking With Respect to the City and the Village

Finally, the government has moved for summary judgment as to the claims asserted by the City and the Village. It argues that they are not owed compensation because they, like CPD, are municipal corporations in the state of Illinois, which retains authority over the use and disposal of their property. See The United States' Mot. for Partial Summ. J. Against Pl. City of Canton and Mem. in Supp. (Def.'s City of Canton Mot.) at 9–10, ECF No. 73; The United States' Mot. for Partial Summ. J. Against Pl. Village of Norris at 1, ECF No. 81. Because CPD acted on behalf of the state when it invoked the Trails Act, the government reasons, the City and the Village are not eligible for compensation. See Def.'s City of Canton Mot. at 9–10, 12–13.

As the Supreme Court has observed, municipalities, like private landowners, may be entitled to compensation "when the federal government takes their private property." United States v. 50 Acres of Land, 469 U.S. 24, 31 (1984) (observing that "[w]hen the United States condemns a local public facility, the loss to the public entity, to the persons served by it, and to the local taxpayers may be no less acute than the loss in a taking of private property"); see also United States v. Carmack, 329 U.S. 230, 241 (1946).

Nonetheless, the Court agrees with the federal government that the Fifth Amendment does not mandate compensation for the City or the Village under the circumstances presented in this case. It is well established that a municipality's interests in the land it owns are subordinate to the authority of the state, which retains near-plenary power over its municipalities' property. See Hunter v. City of Pittsburgh, 207 U.S. 161, 178–79 (1907) (stating that the "power is in the state" to "take without compensation [a city's] property, hold it itself, or vest it in other agencies, expand or contract the territorial area, [or] unite the whole or a part of it with another municipality"); see also City of Trenton v. New Jersey, 262 U.S. 182, 187 (1923) ("A municipality is merely a department of the state, and the state may withhold, grant or withdraw powers and privileges as it sees fit."); Ward v. Field Museum of Nat. History, 89 N.E. 731, 736 (Ill.

---

[9] The landowners contend that there exists uncertainty regarding the terms of any access they would be granted if they were required to sue in state court to establish their crossing rights. Pls.' Resp. at 44–45. They further contend that this uncertainty affects the market value of their properties, because "the appraiser must determine what a hypothetical buyer would pay for the property in the 'after-taken' condition without any existing and enforceable right to cross the corridor." Id. at 45. But these arguments go to issues of valuation, and not to the question currently before the Court, which is whether the issuance of the NITU itself diminished their crossing rights. See Dana R. Hodges Tr., 111 Fed. Cl. at 459.

1909) (holding that cities are "purely of legislative creation for local government" and that "the [l]egislature may control and dispose of their property as shall appear to be best for the public"). The State of Illinois thus clearly has the authority to dispose of the City's and the Village's property as it sees fit.

Further, the parties do not contest (and the Court assumes) that CPD acted within its statutory authority under Illinois law when it filed the request for public use with the STB. In the Court's view, when CPD filed the public use request with the STB on the state's behalf, the state effectively consented to the federal government holding the City's and Village's properties for use as a trail.  Accordingly, no compensable taking occurred.[10]

The plaintiffs' arguments to the contrary lack merit. They contend that the Federal Circuit "squarely addressed" the issue presented here in Preseault II. Pls.' Resp. to Def.'s Mot. for Partial Summ. J. Against The City of Canton and The Village of Norris (Pls.' City of Canton Resp.) at 8, ECF No. 82. But although the trail sponsor in that case was also a municipal corporation, the landowners were private citizens, not (as here) other state instrumentalities. See Preseault II, 100 F.3d at 1529 & n.3. Pointing to Glosemeyer v. United States, 45 Fed. Cl. 771 (2000), the plaintiffs also argue that "municipalities and other state-governmental bodies have successfully made . . . claims for just compensation pursuant to the Trails Act" in the past. Pls.' City of Canton Resp. at 13. In Glosemeyer, however, the trail sponsor was a non-profit corporation, not another municipal corporation; and the court noted that the "trail easement[] [had] been imposed" on the municipality through "the agreement[] consummated between the railroad[] and the trail provider[]." 45 Fed. Cl. at 774, 782. Here, as noted, the trail sponsor is another municipal corporation with authority to act for the State of Illinois. Accordingly, the holding in Glosemeyer is not incompatible with the Court's determination that the City and the Village are not entitled to compensation.

In summary, the Court concludes that the issuance of the NITU did not result in a compensable taking of the City's or the Village's land. Accordingly, those plaintiffs have no right to compensation based on the issuance of the NITU.

## CONCLUSION

For the reasons discussed above, the government's motions for partial summary judgment are **GRANTED**, and the Plaintiffs' cross-motion for partial summary judgment is **DENIED**. The parties shall file a joint status report by **October 27, 2017** apprising the

---

[10] This situation somewhat resembles a factual scenario identified by the Supreme Court in Carmack under which no compensable taking would occur. See 329 U.S. at 241 n.12 (observing that an obligation to pay compensation to a state or political subdivision "does not arise" when "a sovereign state transfers its own public property from one governmental use to another").

Court of the status of their settlement discussions and proposing further proceedings in these consolidated cases.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan

ELAINE D. KAPLAN

Judge