# In the United States Court of Federal Claims

Nos. 14-21L/16-405L (Consolidated)
(Filed: August 6, 2018)

| | |
|---|---|
| ELLEN AND MARK S. BALAGNA, et al., | ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| THE UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) ) ) |
| ROBERT AND SUSAN BATTERTON, et al., | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| THE UNITED STATES OF AMERICA, | ) ) |
| Defendant. | ) ) ) |

Keywords: Fifth Amendment; Takings Clause; Rails-To-Trails Conversion; Notice of Interim Trail Use; Valuation; Crossing Rights.

*Mark F. ("Thor") Hearne, II*, Arent Fox LLP, Washington, D.C., with whom were *Meghan S. Largent*, *Lindsay S.C. Brinton*, *Stephen S. Davis*, and *Abram J. Pafford*, for Plaintiffs.

*Sarah Izfar*, Trial Attorney, Natural Resources Section, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., with whom was *Jeffrey H. Wood*, Assistant Attorney General, for Defendant.

## OPINION AND ORDER

**KAPLAN, Judge.**

      This long-running rails-to-trails case is before the Court on cross-motions for partial summary judgment regarding certain issues of valuation. The Surface Transportation Board (STB) issued the relevant Notice of Interim Trail Use (NITU) more than five years ago, but no final trail use agreement has yet been signed. Under existing precedent, the issuance of the NITU resulted in a compensable taking by blocking

Plaintiffs' state-law reversionary interest in land parcels that are currently subject to railroad rights-of-way. See Caldwell v. United States, 391 F.3d 1226, 1234 (Fed. Cir. 2004).

In their motion, Plaintiffs ask the Court to rule as a matter of law that they have suffered a permanent taking of their property interests, even though no final trail use agreement is in place. They further request a ruling that their compensation should be determined under the methodology used in cases involving permanent takings. For its part, the government argues that if there has been a taking, it is at this point only a temporary one, and that the Court should hold off on awarding Plaintiffs any compensation until the duration of the taking is certain—i.e., until a trail use agreement is signed or the negotiations end without such an agreement. It also asks the Court to exclude from consideration the effect that any uncertainty over crossing rights may have on the value of certain landowners' properties.

For the reasons discussed below, the cross-motions are **DENIED**. The Court concludes that, at this juncture, the takings at issue should be treated as temporary in nature and that the measure of compensation awarded to Plaintiffs should be based on a methodology appropriate to temporary takings. It further finds that any uncertainty concerning Plaintiffs' crossing rights caused by the issuance of the NITU may be factored into the valuation process. Finally, the Court rejects the government's argument that an award of compensation be delayed pending completion of the negotiation process between the railroad and the trail sponsor.[1]

## BACKGROUND[2]

The Court detailed the facts of these consolidated cases in a previous opinion on certain liability issues. Balagna v. United States, 135 Fed. Cl. 16, 19–21 (2017). Briefly, Plaintiffs own land abutting a 14.5-mile railroad right-of-way in Fulton County, Illinois. Id. at 19–20. The right-of-way is the subject of a NITU issued by the STB in May 2013. Id. at 20. The NITU was thus issued more than five years ago, but no final trail use agreement has been reached; and the STB recently extended the time period for negotiating a trail use agreement through November 22, 2018. See id.; see also Joint Status Report at 1, July 18, 2018, ECF No. 157.

Plaintiffs filed their complaint in January 2014, and amended it several times that year. ECF Nos. 1, 9, 19, 32, 36. The parties then worked to better define the contours of the landowners' claims, with an eye toward possibly settling the case. E.g., ECF Nos. 22, 38, 43, 45–46, 51, 53, 56, 58, 60, 62, 64. These efforts initially bore fruit, with the parties entering joint stipulations as to certain title matters in July 2015. ECF No. 55.

---

[1] The Court also **GRANTS** Plaintiffs' unopposed motion for leave to file an additional exhibit to their cross-motion, ECF No. 153.

[2] Unless otherwise specified, the facts set forth in this section are undisputed.

By May 2016, however, the parties had reached an impasse. See ECF Nos. 67–69. First, with respect to several properties, the government believed that certain of Plaintiffs' claims were wholly or partially defective, even assuming the eventual execution of a trail use agreement. See Joint Status Report at 2, Apr. 19, 2016, ECF No. 67. As relevant here, the government contested Plaintiffs' assertion that, for properties either divided by the right-of-way or inaccessible save by crossing the right-of-way, the operation of the Trails Act had extinguished any state-law crossing rights held by the landowners. See Balagna, 135 Fed. Cl. at 25–26. Second, and more globally, the parties disagreed about the duration of any taking, given that no final trail use agreement had been reached. See Joint Status Report at 2, Apr. 19, 2016.

At the Court's direction, the parties then filed cross-motions for partial summary judgment on the liability issues related to the discrete properties, including the issue of whether the NITU extinguished any state-law crossing rights. See ECF Nos. 70, 73, 80, 81, 90, 110.

The Court's eventual ruling on the crossing issue had two elements. See Balagna, 135 Fed. Cl. at 25–26. First, as a matter of federal law, the Court held that the Trails Act did not preempt the relevant body of Illinois law concerning crossing rights. See id. at 25–26 & n.9. Thus, the Court explained, the affected landowners "possess[ed] essentially the same state-law crossing rights following the issuance of the NITU as they previously enjoyed." Id. at 25.

Second, assessing the body of state law, the Court determined that "to the extent the prospective trail corridor divides properties or impedes access to such properties, state law will provide the landowners with a right to cross it." Id. The Court acknowledged Plaintiffs' argument that "there exists uncertainty regarding the terms of any access they would be granted if they were required to sue in state court to establish their crossing rights," and noted that they claimed that "this uncertainty affects the market value of their properties." Id. at 26 n.9. The Court concluded, however, that those arguments went "to issues of valuation," which were not then before it. Id.

On February 9, 2018, some four months after the Court issued its decision, the parties updated the Court on the status of the case. Joint Status Report, Feb. 9, 2018, ECF No. 138. Based on their report, it appeared that the parties still could not resolve their disagreement over the "fundamental question of the duration of the taking." Id. at 5. Further, the parties continued to disagree about whether the Court might permissibly account for uncertainty over crossing rights as a matter of valuation. See id. at 5–6 (Plaintiffs characterizing the crossing issue as a matter of recoverable "severance damages"); id. at 8–9 (government describing the issue as a matter of "hypothetical" and/or "consequential damages").

Following a status conference, the Court instructed Plaintiffs to brief the issue "whether, as a matter of law, the Court may ascertain the measure of Plaintiffs' damages at present, where negotiations over a final trail use agreement are ongoing and a final trail use agreement may or may not be executed." Order at 1, Mar. 22, 2018, ECF No. 140. The Court also gave the government the option of filing a cross-motion on "the issue of

the valuation of crossing rights and severance," if it wished to do so. Id. The parties have now filed and fully briefed these cross-motions and the issues presented are ripe for decision. ECF Nos. 143, 146, 151, 155.

### DISCUSSION[3]

### I.      Standard for Motions for Summary Judgment

The standards for granting summary judgment are well established. Summary judgment may be granted where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Rule 56(a) of the Rules of the Court of Federal Claims; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A fact is material if it "might affect the outcome of the suit under the governing law." Anderson, 477 U.S. at 248. An issue is genuine if it "may reasonably be resolved in favor of either party." Id. at 250.

The moving party bears the burden of demonstrating the absence of any genuine issue of material fact. Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575 (Fed. Cir. 1994). All significant doubts regarding factual issues must be resolved in favor of the party opposing summary judgment. Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390 (Fed. Cir. 1987). "Once the moving party has satisfied its initial burden, the opposing party must establish a genuine issue of material fact and cannot rest on mere allegations, but must present actual evidence." Crown Operations Int'l, Ltd. v. Solutia Inc., 289 F.3d 1367, 1375 (Fed. Cir. 2002) (citing Anderson, 477 U.S. at 248). The court should act with caution in granting summary judgment and may deny summary judgment "where there is reason to believe that the better course would be to proceed to a full trial." Anderson, 477 U.S. at 255.

### II.      The Issuance of the NITU Effected a Taking

As the Court observed in its previous opinion, under the Takings Clause the government must pay just compensation when it "requires [a] landowner to submit to the physical occupation of his land." Balagna, 135 Fed. Cl. at 22 (quoting Yee v. City of Escondido, 503 U.S. 519, 527 (1992)) (alteration in original); see also Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 426 (1982). Further, "the appropriation of a public easement across a private landowner's premises 'constitute[s] the taking of a property interest.'" Balagna, 135 Fed. Cl. at 22 (alteration in original) (quoting Nollan v. Cal. Coastal Comm'n, 483 U.S. 825, 831 (1987)).

In the rails-to-trails context, the operation of the Trails Act leads to a compensable taking where a plaintiff possesses a "state law reversionary interest[]" in land subject to a railroad's right-of-way that is "effectively eliminated in connection with [the] conversion of [the] railroad right-of-way to trail use." Caldwell, 391 F.3d at 1228 (citing Preseault v.

---

[3] The Court has previously explained the basis for its jurisdiction over this case. See Balagna, 135 Fed. Cl. at 21.

United States, 100 F.3d 1525, 1543 (Fed. Cir. 1996) (en banc)); see also Rogers v. United States, 814 F.3d 1299, 1303 (Fed. Cir. 2015) ("The government must provide just compensation under the Fifth Amendment['s] Takings Clause if the issuance of a NITU results in the taking of private property."). Further, under established precedent, the taking occurs "when the railroad and trail operator communicate to the STB their intention to negotiate a trail use agreement and the agency issues a[] NITU," for it is that action which "operates to preclude abandonment [of the railroad right-of-way] under section 8(d)," Caldwell, 391 F.3d at 1233, thereby blocking reversionary property interests and "prevent[ing] the landowner[] from possess[ing] . . . their property unencumbered by the easement," Ladd v. United States (Ladd I), 630 F.3d 1015, 1023 (Fed. Cir. 2010) (footnote omitted).

Notwithstanding the foregoing, in a footnote in its brief, the government "disputes that [its] liability has been determined," arguing for a variety of reasons that the issuance of the NITU may not have effected any taking at all. See The United States' Cross Mot. for Partial Summ. J. on Certain Valuation Issues and Resp. in Opp'n to Pls.' Mot. for Partial Summ. J. on the Standard for the Measure of the Landowners' Damages (Def.'s Resp.) at 9 n.1, ECF No. 146. These arguments, however, are irreconcilable with the binding precedent discussed above.

Nor is there a reason to engage in further development of the factual record in this case regarding whether a taking has occurred under the factors set forth in Arkansas Game & Fish Commission v. United States, 568 U.S. 23 (2012), as the government seems to suggest. See Def.'s Resp. at 9–10 (citing Caquelin v. United States, 697 F. App'x 1016, 1020 (Fed. Cir. 2017)). Here, as in a case with strikingly similar facts recently before Judge Bruggink, application of the Arkansas Game factors would not be likely to yield a result different from that reached under controlling precedent. See Banks v. United States, No. 16-1633L, 2018 WL 2253054, at *6–9 (Fed. Cl. May 17, 2018) (observing that the NITU effected a taking of property because the landowners "have been deprived of the full use of their own property for over six years"; "[t]he NITU plainly caused this impact"; and "[t]he nature of the taking [wa]s foreseeable, severe, not mitigated depending on the quality of the land, and could not be anticipated"). Therefore, the Court holds that Plaintiffs suffered a taking of their property that began on May 24, 2013, when the STB issued the NITU.

## III.    Plaintiffs' Motion for Partial Summary Judgment

### A.    <u>Legal Principles</u>

As the Supreme Court has noted, valuation under the Takings Clause can present difficult factual questions, and thus "[i]t is conceivable that an owner's indemnity should be measured in various ways depending upon the circumstances of each case and that no general formula should be used for the purpose." United States v. Miller, 317 U.S. 369, 373–74 (1943). "In an effort, however, to find some practical standard," the Supreme Court and the court of appeals have approved several potential valuation methodologies, which differ somewhat for permanent and temporary takings. See id.; see also Otay Mesa Prop., L.P. v. United States, 670 F.3d 1358, 1363 (Fed. Cir. 2012) (observing that "courts

use different methods to determine just compensation owed, depending on the temporal classification of [the] taking" (citations omitted)); Yuba Nat. Res., Inc. v. United States, 904 F.2d 1577, 1580–81 (Fed. Cir. 1990). The guiding principle is that "'just compensation' should be carefully tailored to the circumstances of each particular case." See Otay Mesa, 670 F.3d at 1368.

Thus, when the government permanently takes private property, it must "in most cases" pay "the fair market value of the property on the date it is appropriated." Kirby Forest Indus., Inc. v. United States, 467 U.S. 1, 10 (1984); see also Miller, 317 U.S. at 373–74. The usual method for determining fair market value is to ascertain "what a willing buyer would pay in cash to a willing seller." United States v. Va. Elec. & Power Co., 365 U.S. 624, 633 (1961) (quoting Miller, 317 U.S. at 374). And when the interest taken is a permanent easement, the "conventional method" for determining compensation is to calculate "the difference between the value of the property before and after the Government's easement was imposed." Id. at 632 (citing Olson v. United States, 292 U.S. 246, 253 (1934)).

In the case of a permanent taking in the rails-to-trails context, courts begin by establishing the fair market value of the property absent any easement on the date of the taking—that is, by determining the value of the entire fee. See Ladd v. United States (Ladd III), 110 Fed. Cl. 10, 13 (2013) (court looks to "the value of plaintiffs' land . . . without easements – unencumbered property"); Rogers v. United States, 101 Fed. Cl. 287, 296 (2011) ("[T]he 'before' condition of the property . . . was the unencumbered fee simple[] Plaintiffs would have enjoyed . . . absent the taking."). In other words, the court starts with the value of the property assuming that, but for the issuance of the NITU, the former easement for railroad use would have been extinguished. The court may then derive compensation by subtracting the value of the property as burdened by the easement from the value of the entire fee. Ladd III, 110 Fed. Cl. at 13; Rogers, 101 Fed. Cl. at 296; see also McCann Holdings, Ltd. v. United States, 111 Fed. Cl. 608, 614 (2013).

On the other hand, "[i]n the case of a temporary taking . . . just compensation . . . is the value of the use of the property during the temporary taking," measured in terms of "the fair rental value of the property for the period of the taking." Yuba Nat. Res., Inc., 904 F.2d at 1580–81 (citing, inter alia, Kimball Laundry Co. v. United States, 338 U.S. 1, 7 (1949)).

As Plaintiffs note, the case law is not well developed with respect to valuing temporary takings in the rails-to-trails context. See Landowners Reply in Supp. of Mot. for Partial Summ. J. on the Standard for the Measure of the Landowners' Damages and Resp. to the Gov't's Mot. for Summ. J. on "Certain Valuation Issues" (Pls.' Reply) at 22, ECF No. 151. It stands to reason, though, that a court could calculate rental value during such a temporary taking using a methodology similar to that used to calculate the compensation due for a permanent taking in this context—i.e., by first determining the rental value of the entire, unburdened fee during the period of the taking, and then subtracting the rental value of the fee as burdened by the temporary easement.

Alternatively, depending on the circumstances, the proper measure of damages could be the rental value of only the portion of the land that is subject to the easement.

**B.**     <u>**Plaintiffs' Contention that the Court Should Use the Valuation Methodology for Permanent Takings**</u>

In their motion, Plaintiffs contend that although the government's interference with their property interests may end up being a temporary one, their compensation should be determined on the basis of methods used for permanent takings. <u>See</u> Landowners' Mot. for Partial Summ. J. on the Standard for the Measure of the Landowners' Damages (Pls.' Mot.) at 19–20, ECF No. 143. They claim that the taking must be treated as permanent because the government does not "make[] [known] its intention to take the property only temporarily at the outset." <u>See</u> Pls.' Reply at 18.

Plaintiffs' theory—that the taking must be considered permanent from the outset, because the government does not state that it will be only temporary—is inconsistent with the Federal Circuit's decision in <u>Caldwell</u>. In <u>Caldwell</u>, the court of appeals recognized that—in rails-to-trails cases—it would not be unusual for "the precise nature of the takings claim, whether permanent or temporary," to be unclear at the time it accrued. 391 F.3d at 1234 (footnote omitted); <u>see also</u> <u>Ladd I</u>, 630 F.3d at 1025. Thus, if a trail use agreement is eventually reached, "the NITU remains in effect indefinitely," effecting a permanent taking. <u>Caldwell</u>, 391 F.3d at 1234; <u>see also</u> <u>Caquelin</u>, 697 F. App'x at 1018; <u>Ladd I</u>, 630 F.3d at 1025; <u>Preseault</u>, 100 F.3d at 1552. On the other hand, where negotiations end without an agreement being reached, the government's interference with the landowner's reversionary interest is for a finite period of time. <u>Caldwell</u>, 391 F.3d at 1234 (observing that "[trail use] negotiations may fail, and the NITU would then convert into a notice of abandonment"); <u>see also</u> <u>Caquelin</u>, 697 F. App'x at 1018 (after NITU was in effect for 180 days, railway abandoned line and "the easement . . . was lifted"). "In these circumstances," the Federal Circuit has explained, the taking is a temporary one. <u>Caldwell</u>, 391 F.3d at 1234; <u>see also</u> <u>Caquelin</u>, 697 F. App'x at 1019.

In fact, Plaintiffs' theory—that the taking effected by the NITU should be treated as permanent, until and unless the negotiations fail and a notice of abandonment is issued—leads to anomalous results. Its application would mean that when trail use negotiations dissolve within a relatively short period of time, as in <u>Caquelin</u>, a plaintiff's compensation would be determined by how quickly he or she filed their complaint and obtained a decision from the court. Conceivably, for example, a landowner could file suit the day after the issuance of a NITU. If the court reached a decision in the case within a year, the plaintiff would receive compensation for a permanent taking even if the trail use negotiations failed after 18 months. This could provide a windfall to the landowner, as opposed to "just compensation" for the property interest taken.

Finally, Plaintiffs appear to contend that courts should immediately treat the taking as permanent because, if a landowner desires to sell his or her property soon after the issuance of a NITU, a knowledgeable buyer would likely pay no more than the property would be worth with a permanent easement, given the uncertain outcome of the

trail use negotiations. See Pls.' Mot. at 16–17. But even assuming this were true, it ignores the fact that a landowner who sold his property during the interim would still retain his or her claim for just compensation from the United States. See United States v. Dow, 357 U.S. 17, 20–21 (1958) (observing that "it is undisputed that '[since] compensation is due at the time of taking, the owner at that time, not the owner at an earlier or later date, receives the payment'" (alteration in original) (quoting Danforth v. United States, 308 U.S. 271, 284 (1939))). Further, the Supreme Court has held that while "the Fifth Amendment does not forbid the Government to take land and pay for it later," when it does, "the owner is entitled to interest thereon sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." Kirby Forest, 467 U.S. at 10 (citations omitted). Thus, should a permanent taking result, the landowner who sells will yet be eligible to receive the difference in price between market value before and after, plus statutory interest. See id.

Accordingly, Plaintiffs' motion for partial summary judgment requesting a ruling that their compensation be computed on the basis of the methodology that applies to permanent takings is **DENIED**.

## IV.    The Government's Cross-Motion as to Crossing Rights

The government has moved for partial summary judgment with respect to the effect of the NITU on Plaintiffs' crossing rights. See Def.'s Resp. at 13–16. It contends that under this Court's earlier rulings, any claim that the market values of Plaintiffs' properties are diminished by uncertainty regarding crossing rights is too speculative to serve as a basis for compensation. See id. This argument lacks merit.

As discussed above, in determining valuation in rails-to-trails cases, the court compares the value of the entire fee, unencumbered by any easement, to the value of the property as burdened by the easement the government has taken. McCann Holdings, 111 Fed. Cl. at 614; Ladd III, 110 Fed. Cl. at 13; Rogers, 101 Fed. Cl. at 296. Applying this standard, it is readily apparent that in the before-taken state, crossing rights are not at issue because there is no easement that requires crossing.[4] Crossing rights only become a factor in light of the new easement over Plaintiffs' properties, which is the result of the issuance of the NITU.

Further, as the government concedes, when the sovereign takes part of a parcel, the owner receives compensation for the diminution in the value of the remainder (if any). Def.'s Resp. at 14 (citing, inter alia, Bauman v. Ross, 167 U.S. 548, 574 (1897)); see also Moore v. United States, 61 Fed. Cl. 73, 78–79 (2004) ("In assessing

---

[4] The government is thus wrong to suggest that, when it comes to valuation, it is somehow relevant that "Plaintiffs' land has long been encumbered by a railroad corridor." See The United States' Reply in Supp. of its Cross Mot. for Partial Summ. J. on Certain Valuation Issues at 8, ECF No. 155. For valuation purposes, the Court treats the property as though the railroad easement never existed.

compensation, [the court is] concerned with the diminution of value [e]ffected by the imposition of the . . . [t]rail in terms of what a willing buyer would pay for the property."). To be sure, the Court previously observed that "to the extent the prospective trail corridor divides properties or impedes access to such properties, state law will provide the landowners with a right to cross it." Balagna, 135 Fed. Cl. at 25 (citation omitted). But the Court addressed that issue in the context of rejecting Plaintiffs' argument that the Trails Act preempted state law when it came to the landowners' rights to cross the new easement. See id. at 26. It did not determine the scope of such rights or, more importantly, the extent to which any uncertainty over their scope would affect a reasonable buyer (or renter). See id. To the contrary, it expressly noted that such uncertainty could be considered as part of the valuation process. See id. at 26 n.9; cf. Moore, 61 Fed. Cl. at 78–79 & n.6 (observing that while theoretical ambiguity about scope of state-law crossing rights might have market impact, it had not been demonstrated in that case).

Of course, an appraiser might conclude, as the government argues here, that the possibility of future conflict over crossing rights is remote and would not be taken into consideration by a reasonable buyer or renter. But the Court believes that resolution of this issue involves factual determinations not appropriate for disposition on summary judgment. Accordingly, the government's motion for partial summary judgment as to any diminution in value arising out of uncertainty regarding crossing rights is **DENIED**.

## V.      The Government's Request for a Stay Until Trail Use Negotiations End

For the reasons set forth above, at this juncture in the case the Court cannot know whether the taking effected by the issuance of the NITU will ultimately turn out to be a temporary or permanent one. However, the Court rejects the government's suggestion that the valuation portion of this case be stayed for an apparently indefinite period of time while the railroad and the trail sponsor continue their negotiations (now in their sixth year). See Def.'s Resp. at 13. Such a delay is unfair to Plaintiffs given that—at this point—they have been deprived of their property interests for more than five years and the parties have no insight into when the ongoing negotiations between the railroad and the trail sponsor will end.

Moreover, the Court does not see why uncertainty as to whether the taking that began with the issuance of the NITU will ripen into a permanent one precludes it from fashioning any remedy at all to address the particular circumstances presented. For example, in the Ladd case, Judge Hodges endorsed an approach in which: 1) an appraiser would determine the total value of the temporary taking beginning with the date that the NITU was issued and ending on the date of his Order; 2) the appraiser would develop "a daily factor for determining value at a later date if necessary"; 3) the value would be recalculated using the later date "[i]f or when the Railroad files a Notice of Consummation of Abandonment"; and 4) the Court would retain jurisdiction to enter judgment on that basis. Ladd v. United States (Ladd II), 108 Fed. Cl. 609, 616 (2012), aff'd in part and rev'd in part, 713 F.3d 648 (Fed. Cir. 2013).

While this method is not an ideal one, in that it does not result in the immediate entry of a final comprehensive judgment in the case, it is an option. There may be other options and/or the parties may wish to settle the case rather than keeping it open until the trail use negotiations end. At this point, the Court does not have the benefit of the parties' views about other options to address the indefinite nature of the temporary taking in the valuation process. Nor has it heard any expert testimony regarding the valuation of the properties in their pre- and post-taking state. Accordingly, it rejects the government's argument that the valuation portion of this case should be stayed.

## CONCLUSION

For the reasons discussed above, the parties' cross-motions for partial summary judgment are **DENIED**. The parties shall file a joint status report by **September 7, 2018**, apprising the Court of the status of their settlement discussions and proposing further proceedings in these consolidated cases.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge